504 So.2d 1297 (1987)
Margaret A. FREEMAN, Appellant,
v.
James M. LANE, Individually, As Trustee, Appellee.
No. 86-773.
District Court of Appeal of Florida, Fifth District.
February 26, 1987.
Rehearing Denied April 2, 1987.
Kelvin L. Averbuch of Newman and Eaton, Orlando, for appellant.
*1298 John A. Reed, Jr., and David E. Peterson of Lowndes, Drosdick, Doster, Kantor & Reed, P.A., Orlando, for appellee.
COBB, Judge.
Margaret A. Freeman appeals the lower court's order invalidating her attempted revocation of a trust on the basis that it was induced by undue influence. The case began with the filing of a complaint for declaratory relief by the appellee, James M. Lane, as Trustee, under a trust agreement established by Margaret in 1979 from funds she had inherited from her husband, who died in 1977.[1] The revocable trust provided that in the event of Margaret Freeman's death, her six children  Julia Freeman Simkins, James Freeman, William Freeman, Richard Freeman, John Freeman and Mary Lane  would receive the distribution of the remaining trust property.
Lane's complaint stated that on August 22, 1984, Margaret Freeman, by letter from her attorney, Hope Strong, notified him that she wanted to terminate the trust. The complaint further stated that Julia Simkins and Mary Lane had informed Lane that the decision to terminate the trust was made under the undue influence of their brothers and co-beneficiaries, John and James Freeman, and that his compliance with the termination of the trust agreement would constitute a breach of his fiduciary duties to the beneficiaries of the trust. The complaint asked the court for a declaratory judgment establishing the trustee's right to terminate the trust agreement without liability. It also sought an award of trustee fees.
Subsequently, Margaret Freeman filed a complaint against James Lane, individually and as trustee, requesting an accounting of the trust assets and asking for revocation of the trust and damages for conversion of trust property, fraud and intentional infliction of emotional distress. These cases were consolidated and a nonjury trial was held, resulting in the judgment now on appeal.
Margaret Freeman testified at trial that she never understood the trust agreement, could not obtain satisfactory accountings from Lane, and that Lane was unreasonably restrictive in doling out money for her use. She decided to revoke the trust because she was "tired of answering to Jim Lane for every cent of money that I tried to get... ." She also testified that her son John wanted her to control her own money and urged revocation.
Margaret Freeman's daughters, Mary Lane and Julia Simkins, testified that their brothers exercised great influence over their mother. Margaret's son James testified that Margaret was competent and that James Lane had mishandled the trust. Margaret's physician, Dr. Fleming, testified that she was mentally competent, although she had undergone several hospitalizations involving seizure activity and mental confusion. She suffered from cerebrovascular disease (hardening of the brain arteries) and was "confused and disoriented" according to a nurse's notes at the time of her last hospital discharge in 1985. Margaret's priest, and her attorney, Strong, both testified that she was mentally competent.
James Lane (Freeman's son-in-law) testified that when he first discussed the trust with Margaret Freeman, he was acting in accordance with the late Mr. Freeman's request (Lane was the personal representative of Mr. Freeman's estate). He stated that he completely explained the trust to her, and that at the time she was mentally alert and asked the appropriate questions. He stated that he then hired an attorney, Charles Sheffield, to draw up the trust agreement. He testified that at the time Margaret signed the agreement, the attorney explained the terms thoroughly to her and she appeared to understand. Lane stated that after the trust was instituted, he informed her that he would be giving her accountings, but that she told him she didn't need them and if she wanted them she would ask him for them. He stated that she never asked for them until the *1299 conflict in question took place. He additionally stated that he always gave her money when asked and that he didn't notice any wasting of her trust assets with the exception of an investigation Margaret had made into her father's death.[2] Lane testified that when he received the letter of revocation from Attorney Strong, he contacted Strong, stating that he wanted a fee for administration of the trust in the amount of $70,000, or 1/6 of the trust assets. Strong suggested that he meet face-to-face with Margaret.
Lane said he told Margaret of his desires at a meeting in February, 1985, and also of his concern over her operating without the benefit of a trust. Margaret said at that time she couldn't recall ever signing a trust, just a will. Lane testified that he became concerned after the meeting because of her memory lapse in regard to the trust and her apparent poor physical health. Lane added that Margaret appeared competent to handle her daily affairs, and that she knew what was going on around her. He also testified that he was personally unaware of any undue influence that John or James Freeman had used on Margaret.
After hearing all the evidence, the trial court made the following verbal observations:
... There is one thing, of course, that the printed record really doesn't show and that is the demeanor of the witnesses while they testified. And I'm almost as old as Mrs. Freeman is, but I sit here looking at her and seeing her maybe sleep through most of the testimony in the day, I realize that she unfortunately is an old 69. And I really find that in looking back over the notes of her testimony she did on redirect say that she had only had to wait for her money two to five days, but many times she was confused in her testimony.
She said she guessed she was just confused at least once. Several times she said, "I can't remember," on the redirect and, "I don't know what I mean by that," and "I just don't remember." And several times in answer to questions, she first said, "No," then said, "Maybe," and then said, "Well, yes."
I really feel that the Court does need to protect people from their mental incompetence and that this is such a case and that Mrs. Freeman unfortunately does not have the mental capacity to handle her own affairs at this time.
Therefore, the Court is going to find that the trust has not been validly revoked. I really think that probably when a new trustee is appointed  and maybe if one thing is to be faulted, it's that this trust grew very rapidly in recent years and all the eggs are in one basket.
I think may be another trustee might sell some of those assets and let Mrs. Freeman dip into the corpus since she certainly doesn't have that many more years left. And if she wants to have some money to send the son to law school, I think that would be a fine object for the trust to do.
But in any event, I just don't believe from all of the testimony and her demeanor that she is capable of handling her affairs.
The court's final judgment provided, in pertinent part:
On 22nd August, 1984 Margaret A. Freeman signed and caused to be delivered to James M. Lane a notice purporting to revoke the trust. Said notice is in evidence as Lane's Exhibit 2. At the time of the execution of that notice and at the time of trial, the Court finds that Margaret A. Freeman, by reason of mental and physical disability, was incapable of managing and protecting her property, would likely dissipate the property and did not understand the nature and extent of her property, including the protection afforded her by the trust. The court finds the execution of the notice purporting to revoke the trust was induced by undue *1300 influence exercised on Margaret A. Freeman. The evidence, therefore, does not support the relief sought in Count Two of the complaint in Case No. 85-3357.
Appellee's initial complaint alleged that Freeman's revocation of the trust could be invalid because of undue influence and contained no allegations of incompetency on the part of the settlor. Appellant contends that an allegation of undue influence standing alone will not prevent revocation of a revocable trust, and, therefore, her motion for judgment on the pleadings should have been granted.
The Florida Supreme Court analyzed the effect of undue influence on the revocation of a trust in Florida National Bank of Palm Beach County v. Genova, 460 So.2d 895 (Fla. 1984). In Genova, the supreme court overturned a lower court finding that Genova's attempts to revoke a revocable trust were effected through the use of undue influence and were therefore invalid and of no legal significance. The supreme court found that the principle of undue influence has no place in determining whether a competent settlor can revoke a revocable trust. The court pointed to the uniqueness of a revocable trust, stating that by definition "when a settlor sets up a revocable trust, he or she has the right to recall or end the trust at any time, and thereby regain absolute ownership of the trust property." Id. at 897. The supreme court thus distinguished the revocable trust from other types of conveyances to which the principle of undue influence was applied, i.e., gifts, deeds, wills, contracts, etc. The court, discussing inter vivos gifts, distinguished them from revocable trusts in that once an inter vivos gift is made the donor no longer retains any control over ownership of the property, and the only way the donor can regain outright ownership of his interest is to allege undue influence. The court noted that on the other hand "the beneficiaries of a revocable trust do not come into possession of any of the trust property until the settlor's death." Even this interest is "contingent upon her not exercising her power to revoke." Id. at 897. The court stated: "Since she is the sole beneficiary of the trust during her lifetime, she has the absolute right to call the trust to an end and distribute the trust property in any way she wishes." Id.
In the present case, the complaint contained only allegations of undue influence. Therefore, the motion for judgment on the pleadings should have been granted in appellant's favor. Appellee's argument that incapacity inheres in an allegation of undue influence is refuted by Genova. Thus, we find that the trial court erred in failing to grant the motion.
Even if the pleadings had raised the issue of competency and Freeman's motion for judgment on the pleadings properly had been denied, our ultimate resolution of this appeal would be the same. It is apparent from the comments by the trial judge, quoted above, that he erroneously concluded that the mental capacity to revoke a trust is equated with the capacity to handle financial matters. This is not the law. In order to revoke a trust, one merely needs to have the capacity to understand the nature of the transaction, not necessarily an aptitude in dealing with financial matters. If the position of the trial court and the appellee were correct, then the standard applicable to invalidate a revocation would be similar to that required for an adjudication of incompetency under section 744.331, Florida Statutes (1985), without the safeguards contained therein.
There was not competent, substantial evidence to support a finding that Margaret Freeman did not have the competency to understand the nature of the transaction when she revoked her trust. Each witness who testified as to her competency testified that she was competent in this respect. Attorney Strong, who handled the revocation of the trust, testified that at that time he felt that Margaret understood the objects of her bounty, knew what she was doing and wanted to do it. Margaret's son James testified that he felt that Margaret was competent. Dr. Fleming, Margaret's physician, testified that Margaret understood the objects of her bounty, was not senile and understood normal day-to-day *1301 operation. Margaret's priest, Francis Friddell, testified that Margaret was normal and mentally competent. James Lane and Attorney Sheffield, who drafted the trust, testified that at the time Margaret executed the trust she appeared mentally alert and competent. Lane also testified that Margaret appeared competent to handle her daily affairs and that she knew what was going on around her. The only evidence which appeared to suggest that Margaret may have been incompetent was not direct, but circumstantial. Evidence of isolated incidents of irrationality, confusion and forgetfulness cannot suffice to establish a continuing condition of incompetency. There was no evidence of the latter. As shown by the trial judge's comments, his findings primarily were based on his observation of Margaret's demeanor during trial. Although demeanor is important, it goes to the credibility of the witness. Standing alone, it is not competent, substantial evidence to support a finding of incompetence. See Dworkis v. Dworkis, 111 So.2d 70 (Fla. 3d DCA), cert. denied, 115 So.2d 6 (Fla. 1959).
REVERSED and REMANDED for further proceedings consistent with this opinion.
ORFINGER and COWART, JJ., concur.
NOTES
[1] Margaret Freeman's trust consisted mostly of shares of Old Republic stock. The stock has increased some five-fold since the initiation of the trust and is currently worth over $1,000,000.
[2] The testimony showed that Margaret's father had died in 1929 under mysterious circumstances, and many people thought that he had been involved in some illegal events. The investigation cost some $25,000. Margaret testified that she did this investigation with the hope of clearing her father's name and acquiring some of his reputed assets.